Daniel J. KEAR, Appellant,

v.

Ivan HILTON, U.S. Marshal, Appellee.

No. 82–6466.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 6, 1982.

Decided Jan. 31, 1983.

J. Flowers Mark, Alexandria, Va. (William B. Moffitt, Mark & Moffitt, P.C., Alexandria, Va., Robert C. Watson, Melinda Douglas, Washington, D.C., on brief), for appellant.

Leonie M. Brinkema, Asst. U.S. Atty., Alexandria, Va. (Elsie L. Munsell, U.S. Atty., Alexandria, Va., Murray R. Stein, Associate Director, Office of Intern. Affairs, Rex Young, Trial Atty., U.S. Dept. of Justice, Washington, D.C., on brief), for appellee.

Before HALL and MURNAGHAN, Circuit Judges, and MICHAEL *, District Judge.

MURNAGHAN, Circuit Judge:

Again we confront an example of the old adage that two wrongs do not make a right. We do so in the context of a petition for a writ of *habeas corpus* seeking to prevent extradition of Daniel J. Kear to Canada to face a criminal charge of kidnapping.

Sidney L. Jaffe was a bail jumper. A professional bonding company was the surety under bonds in the aggregate penal amount of $137,500, given to insure his appearance to answer to criminal charges in Florida. Jaffe, after being admitted to bail, went to Toronto, Canada and exhibited a determination to remain there in violation

---

* The Honorable James H. Michael, Jr., United States District Judge for the Western District of Virginia, sitting by designation.

of his undertaking to return to Florida to answer the charges.[1]

■ Professional bondsmen in the United States enjoy extraordinary powers to capture and use force to compel peremptory return of a bail jumper. They may do so not only in the state where the bail was granted, but in other states as well, without resort to public authorities, either the police to effect the arrest or the appropriate state officials to bring about extradition. *Taylor v. Taintor,* 83 U.S. (16 Wall.) 366, 371, 21 L.Ed. 287 (1872).[2] However, the authority to act directly and without recourse to officialdom has been determined to exist only with respect to captures by American bondsmen when they locate the violator of bail conditions within the United States.

In *Reese v. United States,* 76 U.S. (9 Wall.) 13, 21–22, 19 L.Ed. 541 (1869) the Supreme Court discussed the very point. The person admitted to bail by a federal court in California removed himself to Mexico. The Court stated:

By the recognizance the principal is . . . so far placed in [the sureties'] power that they may at any time arrest him upon the recognizance and surrender him to the court, and, to the extent necessary to accomplish this, may restrain him of his liberty. *This power of arrest can only be exercised within the territory of the United States;* . . . . The government thus consented that Limantour might depart out of the territory of the United States to a foreign country, *where it would be impossible for the bail to exercise their right to arrest and surrender him;* . . . .

(Emphasis supplied).[3]

■ Canada maintains with Americans friendly relationships on both private and official levels, leading many of us to feel quite at home. Perhaps not appreciating that Canada is, nevertheless, a sovereign and independent country, Kear, a licensed bondsman and an agent of the surety, joined another, Timm Johnson, whose occupation was that of a professional skip-chaser or bounty hunter, in apprehending Jaffe. The quarry was seized in his jogging costume as he returned to his residence in Toronto, Canada. Immediately Kear and his colleague initiated a journey, taking Jaffe, an unwilling participant, with them. The journey led them across the border at or near Niagara Falls, New York and thence to Florida.[4]

Presumably congratulating himself on the outcome, Kear no doubt was rudely jolted to learn that Canadian authorities

---

1. Jaffe, a United States citizen at the time he was admitted to bail in Florida, obtained Canadian citizenship after crossing the international boundary.

2. We proceed on the assumption that the *Taylor* decision, which has never been overruled, remains the law. Neither party would appear to be in a position to seek abrogation of the rule in *Taylor's* case. Neither, at any rate, has sought to do so. However, we note, in passing, that it has been a long time since 1872. In the meantime, the Supreme Court has imposed requirements of recourse to the judicial process to reclaim property interests. *E.g., Fuentes v. Shevin,* 407 U.S. 67, 72, 92 S.Ct. 1983, 1995, 32 L.Ed.2d 556 (1982) ("But no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred."). It seems reasonable to suppose that liberty interests may be entitled to similar protection. *Cf.,* however, *Ownbey v. Morgan,* 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921).

3. In Canada, however, the law is otherwise. A surety has no right to arrest the accused without an order of the court. *See* Criminal Code, *Revised Statutes of Canada* c. C–34, S. 700(1) (1970). While Section 702 of the Canadian Criminal Code does preserve the common law right of a surety to seize the accused and deliver him to a justice, thereby discharging contractual obligations, nevertheless section 449 of the Canadian Criminal Code mandates that "[a]nyone other than a peace officer who arrests a person without a warrant shall forthwith deliver the person to a peace officer." *Id.* ss. 702, 449 (1970).

   Thus, contrary to the American practice, Canadian law, by requiring forthwith delivery to a peace officer, forbids peremptory return to a distant court.

4. Jaffe has subsequently been convicted and sentenced to five years on each of 28 counts, which worked out to a term or terms aggregating, on a consecutive basis, forty years. The Florida court additionally imposed fines aggregating $140,000.

took a very jaundiced view of his behavior. Canada has sought to extradite Kear, having charged him and issued a warrant for his arrest, claiming violation of a statute which makes it a crime to kidnap a person with the intent to send or transport the person kidnapped out of Canada against his will. Canadian Criminal Code § 247(1)(b).

Kear contests extradition on three interlocking grounds:

1) The Treaty of Extradition between the United States and Canada only operates for crimes punishable by the laws of both contracting parties, and behavior comparable to Kear's would not amount to kidnapping under 18 U.S.C. § 1201(a)(1) and (2) if a Canadian were to capture a bail skipper somewhere in the United States, and, without further ceremony, were to return him to the Canadian court to stand trial on the charges as to which admission of bail had been granted.

2) Canadian law allows peremptory capture and return by a bondsman of a bail jumper, thereby creating an implicit exception to the provisions of Canadian Criminal Code § 247(1)(b).

3) There was no kidnapping since Jaffe, having consented, at the time bail was granted, to his seizure and return to Florida at any time, was not transported out of Canada "against his will."

First we address the contention of Kear that the treaty requirement of mutuality has not been met. The Treaty of Extradition between the United States of America and Canada, 27 UST 983, TIAS 8237 by Article 2 provides:

Persons shall be delivered up according to the provisions of this Treaty for any of the offenses listed in the Schedule annexed to this Treaty, which is an integral part of this Treaty, provided these offenses are punishable by the laws of both Contracting Parties by a term of imprisonment exceeding one year.

The Schedule referred to explicitly lists kidnapping.[5]

The comparable kidnapping statute of the United States, 18 U.S.C. § 1201(a)(1) and (2), provides:

(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when:

(1) the person is willfully transported in interstate or foreign commerce; (2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States; . . . shall be punished by imprisonment for any term of years or for life.

The argument of Kear seems to run that a Canadian peremptorily arresting, somewhere in the United States, a person who had jumped bail in Canada, and returning him to appear before a Canadian court, would not be guilty of kidnapping under 18 U.S.C. § 1201. The rationale advanced, however, depends solely on cases relating to seizures within the United States for return to appear before a federal or state court. Those cases are simply inapposite to a situation such as the one which confronts us, where considerations of sovereignty and the crossing of an international boundary intervene and there is neither a superimposed structure like the federal government in its relationship with the several states nor any full faith and credit clause (Article IV, Section 1 of the United States Constitution) and its requirement of aid and assistance in enforcement of the laws of sister states.

Consequently, we do not accept the contention that 18 U.S.C. § 1201 would, in contradiction of its plain terms, be held not to reach bounty-hunting abductions across international boundaries, absent a rule of law making such abductions legal. That critical distinction destroys Kear's argument that, reciprocally treated, his conduct

---

5. The treaty further provides in Article 10:

Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person shall be found . . . to justify his committal for trial if the offense of which he is accused had been committed in its territory.

was not a crime under American law. It is not, we accept, so long as the behavior does not extend beyond national boundaries. Here, however, the international dividing line, and, hence, the sovereignty of a foreign power were infringed.

Such American authority as there is would seem collaterally to tend the other way. *See Villareal v. Hammond,* 74 F.2d 503, 506 (5th Cir.1934) ("In violation of the sovereignty of the state (Mexico) where he had sought asylum, they (Appellants) seized him unlawfully, and with force and arms took him unlawfully out of that state and into another (Texas) to dispose of him at their will and pleasure to obtain a reward.").

In short, there is mutuality between the two statutes, each punishing as kidnapping the transportation of someone (a) "out of Canada against his will" or (b) "in foreign commerce" while "seize[d], confine[d] . . . or abduct[ed]."

Turning now to whether there was a breach of Canadian law when Kear returned the bail jumper, Jaffe, to an American court, we first observe that, in charging Kear with kidnapping and seeking his extradition, Canadian authorities manifestly believe that he violated the Canadian statute. We should not rush to insert ourselves and possibly preempt the Canadian courts who doubtless are better prepared to answer the question than we are. We should be slow to restrict the application of the Treaty in that fashion.[6]

It should not be overlooked that the circumstances in Canada differ markedly in at least one other salient respect from those in the United States in that the practice of bonding for compensation is not permitted.[7] Consequently, those who go security for someone being admitted to bail are relatives, friends or acquaintances acting for non-monetary reasons. That may, in substantial part, explain the Canadian determination to prosecute Kear. Even, however, were professional bonding permitted in Canada, nevertheless, Canada permissibly might take a dim view of aliens descending upon it and abducting persons located within its borders, without prior resort to legal process or to Canadian officials. It is a function for the Canadian courts to determine whether abrupt seizure and transportation across the international border is or is not a criminal offense under a statute which facially at least plainly extends to such behavior.

*Cf. Collier v. Vaccaro,* 51 F.2d 17, 19 (4th Cir.1931) ("There is evidence to support the contention of the Canadian government that Vaccaro forcibly arrested Price in Canada and forcibly carried him across the boundary into the United States. Even if he had the right to make the arrest in Canada for crime committed in his presence, he had no right to carry Price forcibly out of Canada and into the United States; and, if he did so, he violated the statute against kidnapping. To arrest a man for crime is one thing; to carry him out of his country and away from the protection of the laws of his domicile is another and very different thing.")

Finally, we discard as ineffectual Kear's argument that Jaffe, on being admitted to bail, formally consented for all time to his

---

6. *See Factor v. Laubenheimer,* 290 U.S. 276, 293–94, 54 S.Ct. 191, 195–96, 78 L.Ed. 315 (1933):

   In choosing between conflicting interpretations of a treaty obligation, a narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. For that reason if

a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred.

7. Canadian Criminal Code Section 127(1): "Everyone who wilfully attempts in any manner to obstruct . . . the course of justice in a judicial proceeding . . . (b) where he is a surety, by accepting . . . a fee . . . from or in respect of a person who is released or is to be released from custody, . . . is guilty of an indictable offence. . . ."

being summarily recaptured. (The application for a bail bond signed by Jaffe accorded to the surety "the right to apprehend, arrest and surrender the principal to the proper officials at any time as provided by law.") Whether Kear can employ such a relation forward (a sort of "*nunc pro tunc*"), to create "present" consent at a time when Jaffe was obviously not willing to return to Florida is, at best, a question to be raised by way of defense in the Canadian criminal proceedings. It is not a proper basis for frustrating extradition.

That is particularly the case inasmuch as, even assuming that the contract to consent was irrevocable, as between the parties to it (Jaffe and the surety), it did not bind the Government of Canada, which was not a party. That sovereign power was free to assert that there was in fact no consent by Jaffe to his capture, on that fatal day in Toronto, for purposes of Canadian Criminal Code § 247(1)(b), however much Jaffe may have earlier contracted with his surety not to change his mind.

In sum, circumstances justifying extradition have been established. The denial of a writ of *habeas corpus* by the district court accordingly was proper. The Canadian court may listen sympathetically to Kear as he seeks to portray himself as someone caught in a complexity of intricate international law beyond his imagination or comprehension. The fact that his cohort Johnson may have posed as a member of the Ontario police force might make things a bit awkward, but in all events the matter is one of defense or mitigation to be raised in the Canadian courts. It is not a grounds for refusing to honor the Canadian request for extradition.[8]

AFFIRMED.

_____

**8.** Nor may we allow ourselves to be influenced by dire prognostications of wholesale skipping to Canada by persons admitted to bail, and consequent unfair "protective" refusal of bail in the case of many persons accused of crime who have every intention of appearing on the day appointed for trial. Whether Canada has, or would be willing to develop, a system for cooperation by its officials in securing return to American jurisdictions of bail jumpers is a matter to be pursued in diplomatic and political channels, not in the courts.